# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| *In re*: | Case Nos. 1:20-cv-267 |
| | 1:20-cv-996 |
| **MURRAY METALLURGICAL COAL HOLDINGS, LLC,** | **JUDGE DOUGLAS R. COLE** |

## OPINION AND ORDER

This case involves two appeals from the same Chapter 11 bankruptcy case, Case No. 1:20-bk-10390. The UMWA 1974 Pension Plan and Trust (the Fund) is the appellant in both actions. Through the two appeals, the Fund seeks two forms of relief. First, it asks the Court to reverse the Bankruptcy Court's interim (R. 124)[1] and final (R. 280) orders authorizing certain pre-confirmation payments to "critical vendors;" doing so would allow the debtor to recoup those already-made payments (amounting to roughly $16 million). And then it wants the Court to remand to the Bankruptcy Court for that court to modify the confirmed Chapter 11 plan (the Plan) to distribute those new proceeds to the unsecured creditors (with the Fund constituting some 95% of that creditor class). Murray Metallurgical Coal Holdings LLC (Murray), the debtor in the bankruptcy action, moves to dismiss both appeals,[2] claiming that the Fund's challenges are moot. Because a decision in the Fund's favor

---

[1] All record citations denoted "R. #" are to the bankruptcy court docket for Case No. 1:20-bk-10390. Pin cites are to the internal page numbers of the referenced document.

[2] Murray also moves to stay briefing pending this Court's resolution of its motion to dismiss (Case No. 1:20-cv-996, Doc 15). For the reasons discussed below, that motion is denied as moot. Separately, the Fund seeks leave to file a sur-reply to Murray's motion to dismiss in Case No. 1:20-cv-267. (Doc. 26). The arguments in the proposed sur-reply were adequately considered by the Court and, given the Court's grant of Murray's motion to dismiss, the Court also denies the Fund's motion as moot.

on the issues it raises cannot provide the Fund any relief, at least not without fundamentally changing the already-confirmed-and-implemented Plan, the Court agrees with Murray that the appeals are both equitably and constitutionally moot. Thus the Court **GRANTS** the motions to dismiss (Case No., 1:20-cv-267, Doc. 20 and Case No. 1:20-cv-996, Doc. 15) and **DISMISSES** both appeals.

## BACKGROUND

Murray, along with its parent companies and subsidiaries (the Murray conglomerate), is the largest privately owned coal conglomerate in the United States. (Case No. 1:20-bk-10390, Confirm. Op., R. 860, p. 5). The Fund is a pension fund representing over 2,000 of the Murray conglomerate's current and former workers. (*Id.* at pp. 5–6). The Fund filed a claim of $5.7 billion, making it Murray's largest unsecured creditor. (Case No. 1:20-cv-996, Doc. 16, #6595).[3] Indeed, the Fund's claim represents some 95% of the entire unsecured claim amount in the bankruptcy. (*Id.*).

Murray operated two coal mines—one in Alabama (the Oak Grove Mine), and one in West Virginia (the Maple Eagle mine). (R. 860, p.7). Murray mined and sold metallurgical coal, an upstream component used in steel production. (*Id.*). When the price of metallurgical coal sharply declined in the fall of 2019, Murray suspended operations at its mines and obtained financing to stay afloat. (*Id.* at p. 10). Shortly thereafter, Murray's financial outlook further deteriorated, leading it to file for Chapter 11 bankruptcy in February 2020. (*Id.* at p. 4).

---

[3] The $5.7 billion claim was not originally against Murray itself but against the entire Murray conglomerate. (Objection, R. 610, p. 4). The Fund claimed that Murray was jointly and severally liable for the amount. (*Id.*).

The act of filing a Chapter 11 bankruptcy petition instantly and by operation of law creates an estate possessing substantially all the property of the debtor. 11 U.S.C. § 541. Once the estate is created, the debtor needs court approval before obtaining credit or executing most asset transfers. 11 U.S.C. §§ 363–364. So on the same day Murray filed for bankruptcy, it sought approval to obtain super-priority secured financing to cover its business operations (the DIP[4] financing). (R. 44, p. 9). The DIP lenders proposed to secure this financing with a lien against "all assets and properties of … the debtors." (R. 860, p. 13–14). Murray also sought approval to use some of the proceeds of that financing to pay off some accrued debt it carried with various "critical vendors" to its mining business. (R. 8, pp. 1–2). The bankruptcy court granted both requests. (R. 130; R. 124).

The Fund objected to both the financing and the critical vendor payments. (R. 104; R. 741). To understand why, a brief bankruptcy primer is in order. The Bankruptcy Code establishes a hierarchy for the repayment of debts applicable to all bankruptcy cases: secured interests get priority over unsecured interests. 11 U.S.C. § 507(b). And when a business goes through a Chapter 11 restructuring, the plan must treat similar creditor interests equally. 11 U.S.C. § 1123(a)(4). But as already mentioned, the Bankruptcy Code also authorizes bankruptcy courts to approve pre-restructuring asset transfers—even transfers of the entire estate. 11 U.S.C. 363(b);

---

[4] DIP stands for debtor-in-possession. It refers to a bankruptcy proceeding in which the debtor obtains new funding (which typically is not subject to pre-petition creditor claims) and largely continues to manage corporate operations, subject to court approval. *See* 11 U.S.C. §§ 1107-08, § 363. When correctly implemented, DIP financing allows a debtor to preserve the going-concern value of the entity, which benefits the bankruptcy creditors by increasing asset values. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

3

*Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986). And, assuming certain conditions are met, such sales even may be "free and clear of any interest in such property of an entity." 11 U.S.C. § 363(f).

At least some courts have read § 363(b) as providing authority for the debtor to make what are called "critical vendor payments," which is the use that Murray made of the provision here. *See, e.g.*, *In re Windstream Holdings Inc.*, 614 B.R. 441, 456–60 (S.D.N.Y. 2020) (discussing critical vendor justification); *but see, e.g., In re MacMillan*, 652 B.R. 812, 815 (Bankr. D. Or. 2023) (concluding that § 363(b) does not authorize critical vendor payments).[5] The general idea is that certain vendors may provide critical inputs to a debtor's ongoing operations. If the debtor does not pay the outstanding amounts due those vendors may cease to provide those inputs, harming the going-concern value of the debtor. *Id.* That harms all creditors.

But, of course, such payments also lead to the prospect of certain unsecured creditors (those deemed "critical") receiving better treatment than other creditors in that class (like the Fund). For example, a court may approve a § 363(b) transfer to one unsecured creditor to cover pre-petition debts, but not to another, leaving the latter to recover, if at all, solely through the bankruptcy plan. The first creditor immediately receives 100 cents on the dollar (or whatever the approved amount of

---

[5] The Fund did not argue, either before the bankruptcy court or here, that § 363(b) does not authorize critical-vendor payments. To the contrary, the Fund conceded in the bankruptcy proceeding that "upon specific factual showings, it is appropriate to pay the pre-petition debts of truly critical vendors who would not otherwise perform." (R. 104, p. 2). And it reiterated this point in its appellate brief before this Court. (Case No. 1:20-cv-267, Doc. 8, #2242-43) ("[C]ritical-vendor motions should be granted only in exceptional circumstances."). Thus, the Fund has waived any argument that it may have had that § 363(b) never authorizes such transfers.

4

the § 363(b) transfer may be), while the latter is left to the vagaries of the plan process.

Given the possible inequities that may occur within creditor classes, and the tension that this potential inequity creates with the underlying bankruptcy intra-creditor-class parity principle, various courts of appeals have added common law requirements that must be met before a bankruptcy court can approve § 363(b) transfers. *See In re Kmart Corp.*, 359 F.3d 866, 873–74 (7th Cir. 2004) (requiring bankruptcy court to evaluate other ways to keep vendors such as lines of credit, among others); *Matter of Bouchard Transp. Co., Inc.,* 74 F.4th 743, 750 (5th Cir. 2023) (requiring some "articulated business justification" for § 363(b) asset distributions).

The dispute here arose when Murray sought to rely on this "critical vendor" justification to allow § 363(b) payments to certain unsecured creditors who were also Murray's vendors. The Fund opposed Murray's request to pay these vendors, unless Murray showed that no feasible alternatives existed to keeping the vendors' business. (R. 104, p. 2). The Fund also claimed that Murray needed to present this proof on a vendor-by-vendor basis. (*Id.*). The bankruptcy court disagreed. It overruled the Fund's objection and authorized the critical vendor payments, holding that Murray provided a sound business justification, and that it need not present individualized proof for every vendor. (R. 270, pp. 15–17). The Fund appealed, which is the first of the two appeals here. (Case No. 1:20-cv-267, Doc. 1).

Meanwhile, the bankruptcy action proceeded. The bankruptcy court authorized Murray to sell its smaller West Virginia mine on April 1, 2020. (R. 860, p.

5

17). Murray filed a plan of reorganization (the Plan) shortly thereafter on August 14, 2020. (R. 691). Under the Plan, Hatfield Metallurgical Holdings, LLC (Hatfield) agreed to buy the Oak Grove Mine and all of its associated assets the day the Plan became effective. (*Id.* at pp. 22, 25, 38–39). The rest of Murray's assets, including the net proceeds from selling both mines, would vest in a Wind-Down Trust, and the trust administrator would then distribute the assets according to the classes of interests set forth in the Plan. (*Id.* at p. 44; Wind-Down Trust Agmt., R. 704, p. 378). All unsecured creditor classes were to receive nothing under the Plan's distribution scheme. (R. 691, p. 34). The Fund (perhaps predictably) objected to confirmation. (R. 741). The bankruptcy court overruled the Fund's objection and confirmed the Plan on November 25, 2020. (R. 798). The Fund, again, appealed. (Case No. 1:20-cv-996, Doc. 1). In particular, the Fund challenges Murray's sale of certain "avoidance actions" relating to the critical-vendor payments. (Case No. 1:20-cv-996, Doc. 16, #6603) As a general matter, avoidance actions refer to actions in which a debtor's trustee seeks to recoup (or "avoid") earlier payments (or asset transfers) the debtor made to creditors. 11 U.S.C. §§ 544, 550. This could include for example, the critical-vendor payments. Under the Plan, Murray sold the right to bring such actions to Hatfield as one of the assets relating to Murray's sale of the Oak Grove Mine.

The case is now before the Court on Murray's motion to dismiss both appeals under Federal Rule of Civil Procedure 12(b)(1).

## LAW AND ANALYSIS

This Court has jurisdiction to hear these appeals from the Bankruptcy Court under 28 U.S.C. § 158(a)(1). And a motion to dismiss for lack of jurisdiction (like the two at issue here) is properly brought under Federal Rule of Civil Procedure 12(b)(1). *See In re City of Detroit*, No. 14-cv-14872, 2015 WL 5697702, at *3 (E.D. Mich. Sept. 29, 2015), *aff'd*, 838 F.3d 792 (6th Cir. 2016).

### A.   The Plan Confirmation Appeal

The Fund appeals the bankruptcy court's confirmation of the Plan, arguing that the Plan's sale of Murray's avoidance actions violates the Bankruptcy Code. (Case No. 1:20-cv-996, Doc. 16, #6602). Murray argues that the appeal is equitably moot because the Plan has already taken effect. The Court agrees.

The equitable mootness doctrine exists "to protect parties relying upon the successful confirmation of a bankruptcy plan from a drastic change after appeal." *In re United Producers, Inc.*, 526 F.3d 942, 947 (6th Cir. 2008). Though described as a mootness doctrine, its legal foundation is more akin to forfeiture or estoppel. *In re City of Detroit*, 838 F.3d 792, 798 (6th Cir. 2016). Equitable mootness focuses less on the *Court's* inability to adjudicate the subject of the case and more on whether the *litigant's* delay in bringing his claim upsets "good faith reliance interests." *See id.* (citing *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994)).[6]

---

[6] The Court notes the legal dissonance in resolving a 12(b)(1) motion utilizing a doctrine which technically has very little to do with jurisdiction. While some have criticized the use of prudential quasi-jurisdictional doctrines, *see In re City of Detroit*, 838 F.3d at 805 (Moore, J., dissenting), their view is not the law, at least as applied to Chapter 11 cases. Equitable mootness is still a viable doctrine. *Id.* at 800 (majority opinion).

7

The Sixth Circuit analyzes equitable mootness using a three-part test: (1) whether the appellant obtained a stay; (2) whether the confirmation plan has been "substantially consummated"; and (3) whether the desired relief would "significantly and irrevocably disrupt" the plan's implementation or disproportionately harm reliance interests of parties not before the Court. *Id.* The third factor is most important. *Id.* at 799.

Factor one is easy. The Fund did not obtain—or even seek—a stay. It acknowledges this. (*See* Case No. 1:20-cv-267, Doc. 23, #2789; Case No. 1:20-cv-996, Doc. 22, #6667). This factor, then, favors Murray. But as the Sixth Circuit has noted, mere failure to seek a stay "is not necessarily fatal" to the appeal.[7] *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1225–26 (6th Cir. 1995).

Factor two is almost as easy. Indeed, the Fund "does not dispute" that the Plan has been "substantially consummated" under the Bankruptcy Code. (Case No. 1:20-cv-267, Doc. 23, #2790; Case No. 1:20-cv-996, Doc. 22, #6668). To determine substantial consumption, the Court looks to the Bankruptcy Code, which considers three things:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

---

[7] While the Fund's failure to seek a stay was not fatal to its Plan confirmation appeal, it almost certainly doomed its critical vendor appeal. Had the Plan been stayed, the critical vendor payments perhaps could have been clawed back (if the Fund is correct that they were inappropriate) without upsetting the heavy reliance interests that multiple third parties have since placed on the Plan's entire structure and consummated transactions.

  (C) commencement of distribution under the plan.

11 U.S.C. § 1101. As described above, the Plan provided for the immediate sale of the Oak Grove Mine to Hatfield and the transfer of the remaining assets to the Wind-Down Trust for distribution. Murray now states that the sale and transfer have taken place and that distributions have started. (Case No. 1:20-cv-996, Doc. 14, #6426–27). So this factor also favors Murray. And in cases like this where a plan has been substantially consummated, there is a "greater likelihood" that overturning the plan will have adverse effects. *In re United Producers, Inc.*, 526 F.3d at 948.

  On, then, to the third (and most important) factor. To determine whether the relief requested would affect the rights of third parties or the plan's success "requires a case-by-case assessment of the feasibility and effect of the relief requested." *In re Detroit*, 838 F.3d at 799. Feasibility often turns on whether the requested relief "amounts to a piecemeal revision" or a "wholesale rewrite[]" of the plan. *Id.* (citation omitted).

  Recognizing this, the Fund disavows any attempt to revoke confirmation of the entire Plan. (Case No. 1:20-cv-996, Doc. 22, #6670–71). Rather, it argues that it is merely tinkering at the edges. According to the Fund, it simply asks this Court to hold that one specific asset group—the avoidance actions—are not sellable estate property and to order that any proceeds realized from any reclaimed avoidance actions be distributed to the unsecured creditors. (*Id.*).

  However, while the Funds characterize this modification as "slight[]," it is anything but. (*Id.*). Consider what went into the avoidance action sale. When Murray

9

obtained the DIP financing, the DIP lenders obtained a lien on all of Murray's assets *including* any avoidance actions. (R. 860, p. 13–14). In other words, if Murray had instituted avoidance actions at some earlier point (as the Fund now suggests it should have), the proceeds would have gone to the DIP lenders, not Murray's other creditors (at least until the DIP lenders were fully repaid). Then consider Murray's sale of the Oak Grove Mine to Hatfield. As part of the mine purchase, Hatfield bought Murray's right to institute any avoidance actions. (R. 860, p. 30). To facilitate the sale, Hatfield obtained financing to pay the purchase price *and to buy out the DIP lender's lien*. (R. 860, p. 24, 30; R. 691, p. 30). The right to bring the avoidance actions (and the liens on any proceeds from them) were thus baked into the purchase price and were "integral" to the entire deal. (R. 860, p. 113). And that makes sense. Hatfield presumably wanted to continue using those vendors to supply its operations at the Oak Grove Mine post-acquisition, so it presumably wanted to control the decision on whether to pursue attempted recoupment of past payments to those vendors. Any effort to now undo the avoidance action part of that arrangement would strike at a core aspect of the deal, essentially sending all parties back to the drawing board.

Consider further the Plan modification needed to distribute any avoidance action proceeds to the unsecured creditors, which is the ultimate relief the Fund seeks. Under the Plan, any assets not transferred to Hatfield as part of the Oak Grove Mine sale would vest in the Wind-Down Trust. (R. 691, p. 44). So if the avoidance actions (or any proceeds from them) return to the estate, they would revert to the Wind-Down Trust, which can only distribute assets according to the Plan hierarchy.

10

(*Id.*). But the Plan completely extinguished the Fund's interests—it distributes nothing to unsecured creditors. *(Id.* at p. 34). Any avoidance action proceeds would instead go to the two classes of *secured* creditors (classes three and four) that did not fully recover under the Plan. Class three, for example, the Prepetition Term Loan Claims, received under the Plan only $168 million against some $212 million in claims. (*Id.* at pp. 33-34 (noting allowed amount); *see also* R. 87, p. 6 (showing claimed amount)). Granting the relief the Fund seeks, then, would require the Court to alter the distribution scheme, which was presumably central to the Plan's implementation. (*See* R. 691, pp. 33–34 (providing the two impaired classes with the ability to accept or reject plan)).

All in all, the Fund's purportedly limited request amounts to a substantial rewrite of the entire Plan—something the doctrine of equitable mootness was designed to prevent. The Court holds that this appeal is equitably moot.

**B.     The Critical Vendor Appeal**

The Fund's critical vendor appeal fares no better. Because the Court finds that the Plan confirmation appeal is moot, the Plan remains intact. And the terms of the Plan render this appeal constitutionally moot.

Article III § 2 of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." A controversy ceases to exist whenever the parties lack a "legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). When that happens, the case is moot and must be dismissed. *Id.*; *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam).

11

The Fund lacks any ongoing cognizable interest in the outcome of this appeal because, even if the Court were to reverse the bankruptcy court's orders authorizing the critical vendor payments, the Fund would not receive a penny. As recounted above, all assets not sold to Hatfield were transferred to the Wind-Down Trust, which then distributes those assets according to the Plan. (R. 691, p. 44). Assuming that (1) the Court reversed the authorization for the critical-vendor payments and (2) the Wind-Down Trust administrator sought to recoup from those vendors, the Fund would still receive nothing because it is a general unsecured creditor. (R. 691, p. 34). Because the Fund would receive none of the proceeds, it has no legally cognizable interest in the validity of the critical vendor payments. The critical vendor appeal is therefore moot.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Murray's motions to dismiss in both Case No. 1:20-cv-267 (Doc. 20), and Case No. 1:20-cv-996 (Doc. 14). The Court **DIRECTS** the Clerk to enter judgment in both cases and **TERMINATE** each on the Court's docket.

September 25, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**